**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DOLORES R.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No.  18 C 3711 |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Dolores R. ("Claimant")[1] brings a motion for summary judgment to reverse the
final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's
application for a period of disability and Supplemental Security Income ("SSI") under the Social
Security Act.  42 U.S.C. §§ 416(i), 402(e), and 423.  The Commissioner has brought a cross-
motion for summary judgment seeking to uphold the Social Security Agency's ("SSA") decision
finding that Claimant is not disabled.  The parties have consented to the jurisdiction of the
United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This Court has jurisdiction to
hear this matter pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3).  For the reasons stated below,
Claimant's motion for summary judgment [8] is granted and the Commissioner's cross-motion
for summary judgment [19] is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social
Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption.
Thereafter, we shall refer to Dolores R. as Claimant.

## I.  BACKGROUND

### A.      Procedural History

On August 10, 2010, Claimant filed a disability application alleging a disability onset date of July 31, 2010.  Her claim was denied initially on November 24, 2010 and upon reconsideration on March 2, 2011.  On May 29, 2012, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant.  After the Appeals Council denied review, Claimant requested review of the Commissioner's decision in District Court on March 4, 2013.  On May 21, 2014, Magistrate Judge Susan Cox reversed the Commissioner's decision and remanded the case to the SSA for further review.  Judge Cox directed the SSA to reconsider Claimant's alleged need to raise her legs to relieve pain, claims that she experienced fatigue, testimony concerning her activities of daily living ("ADLs"), and Claimant's residual functional capacity ("RFC").  *Robinson v. Colvin*, No. 13 C 1654, 2014 WL 2119270, at *6-7 (N.D.Ill. May 21, 2014).

The ALJ held a new hearing on November 13, 2014 at which Claimant and a vocational expert ("VE") testified.  (R. 504-577).  On December 8, 2014, the ALJ again found that Claimant was not disabled.  The Appeals Council denied review and Claimant once more sought judicial review on May 11, 2016.  On May 19, 2017, Magistrate Judge Mary Rowland reversed the Commissioner's decision and remanded the case for a second time.  *Robinson v. Berryhill*, No. 16 C 5152, 2017 WL 2215022 (N.D.Ill. May 19, 2017).  Following Judge Rowland's directive, the Appeals Council ordered the ALJ to (1) evaluate Claimant's fibromyalgia with greater care, (2) consider her alleged need to elevate her legs, (3) consider the fluctuating nature of fibromyalgia symptoms, (4) reconsider Claimant's symptom testimony in light of her treatment history, (5) consider the barriers Claimant experienced to further medical treatment for arthritis

in her right big toe, (6) evaluate the side effects of her medications, and (7) reconsider her fatigue. (R. 1007-08).

On January 10, 2018, a new ALJ held a third administrative hearing at which Claimant, a VE, and a medical expert testified. The ALJ issued a decision on March 5, 2018 finding that Claimant was not disabled. This time, however, Claimant did not file exceptions to the ALJ's decision with the Appeals Council. The Appeals Council may assume jurisdiction over an ALJ's decision under those conditions within 60 days of its issuance, 20 C.F.R. § 404.985(c), but did not do so. Accordingly, the ALJ's decision became the Commissioner's final decision. 20 C.F.R. § 404.985(d). Claimant subsequently filed this action in District Court on May 28, 2018.

### B. Medical Evidence

#### 1. Evidence from Claimant's Treatment History

The Court only addresses Claimant's treatment history in brief because Judge Cox discussed the relevant records at length in her May 21, 2014 decision. *See Robinson*, 2014 WL 2119270, at *2-3. Claimant was diagnosed with a major depressive disorder during a hospitalization for psychiatric problems in 2000. She was prescribed Prozac and Paxil and sought treatment after her release from the hospital from Sara Kozera at Metropolitan Family Services. *Id*. at *2. From 2005 through 2008, her symptoms were controlled with medication. Dosages of Prozac were increased in 2009 and again in 2010 after Claimant reported increased symptoms of depression. *Id*. Claimant began treatment in November 2010 with psychiatrist Dr. Morris Blount and therapist Kristine Fox. Ms. Fox found Claimant to be attentive and within normal limits for most of her mental functioning. *Id*. Claimant also told Dr. Blount in April 2011 that she did not feel depressed and slept well at night. By March 2012, she again reported that she felt well, was not depressed, and slept well. *Id*.

Claimant's physical health conditions were treated by Dr. Robert Boll and nurse practitioner Cathy Moynihan.  Ms. Moynihan's notes show primary complaints of fibromyalgia and a "mild hallux valgus and degenerative changes in the first metastarsophalangeal joint" of Claimant's right foot.[2]  *Id.*  Claimant complained in January 2010 that her fibromyalgia pain was "really bad" and Ms. Moynihan prescribed higher doses of Cymbalta to treat it and also started Claimant on Flexeril.  (R. 259).  Claimant told Ms. Moynihan in January 2011 that Cymbalta helped to manage her pain but that she was also experiencing increased anxiety and confusion. (R. 393).

Claimant also sought treatment in October 2010 with a podiatrist at John Stroger Hospital.  She complained that the pain in her right toe had increased over the past four years. The podiatrist noted that surgery might be necessary in the future to correct Claimant's hallux valgus but recommended a "rocker shoe" and an orthotic extension to treat her condition.  (R. 354). Claimant did not seek treatment after January 2011 for her physical condition until April 2012 when she saw nurse practitioner Maya Karam.  Claimant complained of pain in her upper extremities for which Ms. Karam recommended exercise.  (R. 498).  The record shows that Claimant's medications at that time included Prozac, amitriptyline, amlodipine, ciprofloxacin, gabapentin, Lopressor, lorazepam, metoprolol, and pravastatin.  (R. 496).

## 2.  Evidence From State-Agency Doctors

On November 19, 2010, state-agency psychologist Dr. Michael Schneider found that Claimant suffered from an affective disorder that did not constitute a severe mental impairment. (R. 368).  Dr. Schneider concluded that Claimant would experience mild limitations in her daily

[2] A hallux valgus is a "condition in which the big toe (hallux) is bent outward (toward the midline of the foot; valgus) so that it overlaps the second toe."
http://www.medicinenet.com/script/main/art.asp?ariclekey=6406 (last visited August 17, 2019).

activities, social functioning, and in her ability to maintain concentration, persistence, or pace. (R. 378). Dr. Young-Ja Kim found on November 22, 2010 that Claimant suffered from the non-severe impairments of fibromyalgia and hypertension. (R. 382).

Psychiatrist Dr. Herman Langner interviewed Claimant on November 10, 2010 at the request of the SSA. Claimant told Dr. Langner that she spent much of her time in bed because she was fatigued, cried easily, and was depressed. At times she also heard whispers. Dr. Langner found that Claimant was oriented to time and place and could recall one out of three items after three minutes had passed. He diagnosed Claimant with depression but did not assess any specific restrictions in her functioning. (R. 359-61).

Claimant was examined the same day by examining physician Dr. Mahesh Shah. Claimant told Dr. Shah that she had pain "all over her body" and had been diagnosed with fibromyalgia. The pain affects different joints at different times and sometimes causes problems with her legs and back. Dr. Shah noted that Claimant was able to move about his office "without problems" and had a full range of motion in her upper and lower extremities. No trigger point tenderness was noted. Her gait was normal though some tenderness was noted in Claimant's right big toe. Dr. Shah diagnosed high blood pressure and fibromyalgia pursuant to Claimant's self-reported history, high cholesterol, and – for reasons that are unclear – bipolar disorder. (R. 363-66).

On January 27, 2011, Claimant's treating psychiatrist Dr. Blount submitted a statement titled "Ability to do Work-Related Activities (Mental)." Dr. Blount found that Claimant had an "excellent" ability to make simple work decisions, a "good" capacity to understand and carry out simple instructions, work with others, and complete a normal workday, and a "fair" ability to

carry out detailed instructions, maintain concentration for extended periods, and perform activities within a fixed schedule. (R. 409-410).

Nurse practitioner Ms. Moynihan issued also issued a statement titled "Ability to do Work-Related Activities (Physical)" that was co-signed by Dr. Boll. She found that Claimant could only lift ten pounds frequently, could stand and/or walk two hours a day, but that her fibromyalgia placed limits on her ability to sit or to push or pull. (R. 396-97).

### C. Evidence From Claimant's Testimony

Claimant appeared at the first administrative hearing held on May 7, 2012. She told the ALJ that pain affected her knees and shoulders and that it kept her from being able to grasp or tighten items unless she uses both hands. (R. 66-68). Claimant is unable to climb up a ladder without help because she loses her balance and might fall. (R. 68). She takes amitriptyline for pain every day. Nevertheless, Claimant stated that she could only stand or sit for one hour at a time and could only walk for a block and a half. (R. 70). Even then, she has a hard time getting up after sitting and had lately begun to fall. (R. 83-84). Claimant's depression causes her to cry "sometimes for days" and she has difficulty staying focused and completing tasks. (R. 71).

Claimant told the ALJ that her daily activities were limited in scope. She can do some dishes and other household chores but must take breaks. She also needs to nap up to two to three hours a day due to fatigue. (R. 75). She cleans the bathroom and goes grocery shopping but must have someone help her bring the groceries in because they are too heavy to carry. (R. 76). Claimant told the ALJ that gardening was her favorite activity. However, she stopped gardening a year prior to the hearing because she could not lift the planting pots or get up once she kneeled down. At the time of the hearing, she was only able to grow six tomato plants in buckets instead of in her garden. (R. 76).

At the second hearing on November 13, 2014 Claimant expanded her testimony concerning her daily activities. She told the ALJ that when she was planting tomatoes in 2010 she was unable to squat down and required help to plant and pick the tomatoes even though her garden was only the size of a table. (R. 558). Even then, it took Claimant two to three days to complete the planting. (R. 566). Claimant reiterated her earlier testimony that fatigue requires her to nap two to three hours each day. (R. 560). Claimant also stated that she needs to elevate her legs up to three times a day for 45 minutes especially after carrying out tasks like sweeping and doing the dishes. (R. 552-53). She even has to raise her legs at times in the middle of doing a chore. (R. 553).

At the third hearing held on January 10, 2018, Claimant testified once more that she needed to nap two to three hours daily. (R. 1055). Claimant told the ALJ that she saw her therapist and psychiatrist once a month and that she was currently taking Prozac for depression, lorazepam for anxiety, and an unspecified medication to help her sleep. (R. 1049). The ALJ pointed out that no treating source had ever diagnosed Claimant with fibromyalgia even though the prior two ALJ decisions stated that it constituted a severe impairment. (R. 1050-51). Nevertheless, Claimant testified that she had been prescribed amitriptyline to treat her pain as well as gabapentin and Lyrica. (R. 1052). No doctor ever told her that she should elevate her legs to relieve pain but Claimant continued to do so through the end of 2011. (R. 1055).

### D.     Evidence From the Medical Expert's Testimony

Medical expert Dr. Allan Duby also testified at the January 2018 hearing. Dr. Duby told the ALJ that nothing in the record supported a diagnosis of fibromyalgia for Claimant. Her medical impairments through 2011 included hypertension, elevated cholesterol, and osteoarthritis of the right big toe. (R. 1059). Dr. Duby stated that Claimant could lift or carry up

to ten pounds frequently and 20 pounds occasionally. She could sit for two hours at a time for a total of seven hours a day. She could also stand for one hour at a time up to three hours a day. Dr. Duby assessed Claimant's ability to walk the same as her ability to stand. She would be able to climb stairs and ramps frequently, climb ladders occasionally, and could kneel, crouch, and crawl frequently. (R. 1060).

### E.    The ALJ's Decision

On March 5, 2018, the ALJ issued a decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decisions, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity from the time of her alleged onset date of July 31, 2010 through her last insured date of December 31, 2011. (R. 1010). Claimant's severe impairments at Step 2 were osteoarthritis of the right big toe and a major depressive disorder. Claimant also had the non-severe impairments of hypertension, high cholesterol, a vitamin D deficiency, and obesity. (R. 1010). None of these impairments met or medically equaled a listing at Step 3 either singly or in combination. (R. 1015). The ALJ also applied the "special technique" at Step 3 that is used to assess the severity of a claimant's mental impairments. *See* 20 C.F.R. § 404.1520a (2017). She found that Claimant had a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others and managing herself; and a moderate restriction in concentrating, persisting, or maintaining pace. (R. 1015-17).

Before moving to Step 4, the ALJ evaluated Claimant's testimony concerning the frequency and severity of her symptoms. She rejected Claimant's statements about her depression symptoms – including any fatigue associated with depression – because they were inconsistent with the objective record and because Claimant's statements allegedly needed to be

viewed in light of "the potential for pecuniary gain." (R. 1019). The ALJ also found that

Claimant's statements concerning the restrictions related to her toe arthritis were inconsistent

with the record. (R. 1021-22). In particular, the ALJ noted that Claimant failed to follow up

with care related to her toe. (R. 1022). The ALJ also rejected Claimant's statement about

fatigue and her need to elevate her legs. (R. 1022).

The ALJ then assigned various weights to reports of the medical experts. She gave

"some" weight to the opinions of the non-examining state-agency doctors who found that

Claimant did not have a severe mental or physical impairment. (R. 1023). Some weight was

also given to Dr. Blount's opinion concerning Claimant's mental condition. (R. 1023-24). Little

weight was assigned to Dr. Boll's and Ms. Moynihan's reports. (R. 1024). Dr. Duby's

testimony was assigned great weight. (R. 1023). Based on these findings, the ALJ formulated

the following RFC:

> [C]laimant had the [RFC] to perform light work, as defined in 20 C.F.R.
> 404.1567(b), and could continuously use her left foot to operate foot controls,
> stoop, kneel, crouch, crawl, and climb ramps and stairs, could occasionally climb
> ladders, ropes, or scaffolds, frequently operate a motor vehicle, occasionally be
> exposed to humidity, extreme cold, and heat, and could frequently be exposed to
> pulmonary irritants and vibration. The claimant could understand, remember, and
> carry-out tasks that are more than simple but less than complex and at that level
> make work-related decisions, adapt to routine workplace changes, work
> appropriately with others, and perform such activities with adequate persistence
> and pace.

(R. 1018). Based on the testimony of the VE, the ALJ determined at Step 4 that a person with

Claimant's RFC could perform her past relevant work as a cashier at a garden center. (R. 1024-

25). The ALJ therefore found that Claimant was not disabled without moving to Step 5.

## II. LEGAL ANALYSIS

### A.      The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past

relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

As she did in her second challenge to the Commissioner's denial of benefits, Claimant argues that substantial evidence does not support the ALJ's RFC assessment or the evaluation of Claimant's symptoms. Despite the limited nature of Claimant's sole physical impairment – an arthritic big toe – the Court agrees that the ALJ failed to comply with the directives set out in Judge Rowland's remand order. *Robinson*, 2017 WL 2215022, at *4-8. A third remand of this case is therefore required. *See Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *3 (N.D.Ill. Sept. 26, 2018) (stating that the need for three remands "merits serious reflection on the entire process of administering and adjudicating disability claims").

### A.     The ALJ Failed to Adequately Describe Claimant's RFC

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of ADLs; medical source statements; and the effects of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).[3]

---

[3] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They do not have the force of law or a regulation, though they are binding on the SSA. *Id*.

The RFC must accommodate all of a claimant's limitations that are supported by the record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. That includes an explanation of why the claimant is able "to perform sustained work activities in an ordinary work setting on a regular and continuing basis" eight hours a day for five days a week. *Id.*

The ALJ found that Claimant could perform a range of light work as long as various exertional restrictions were added that limited her need to use her right foot, kneel, crawl, balance, or climb ramps and stairs. (R. 1018). The regulations define light work as requiring the ability to lift ten pounds frequently and 20 pounds occasionally as well as "a good deal of walking or standing." 20 C.F.R. § 404.1567(b). SSR 83-10 further explains that light work "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." 1983 WL 31251, at *5 (1983); *see also Diaz*, 55 F.3d at 306 ("A job in this category requires much walking or standing (off and on, for a total of approximately six hours of an eight-hour workday)[.]"). The ALJ concluded that the RFC of light work allowed Claimant to perform her past relevant employment as a cashier, which the ALJ characterized as involving "five hours of standing [and] one hour of walking." (R. 1025).

Claimant argues that the ALJ failed to explain how she would be able to stand for up to five hours a day. The ALJ assigned great weight to the testimony of medical expert Dr. Duby and based the RFC on his description of Claimant's work capacity. Contrary to the ALJ's finding, however, Dr. Duby described a more limited set of exertional abilities. He testified that she "can sit for two hours at a time for a total of seven hours in a day, *she can stand for one hour*

*at a time [for] a total of three hours in a day*, [and] she can walk for one hour at a time [for] a total of three hours in a day." (R. 1060) (emphasis added). Dr. Duby therefore limited Claimant to a maximum of three hours of standing each work day with a break in standing after each one-hour interval.

The ALJ attempted to justify her omission of the standing restriction in the RFC assessment on three grounds. First, she claimed that Dr. Duby did not mean that Claimant was only limited to standing three hours a day because "no such indication was made by the medical expert." (R. 1023). The Court is unable to follow the basis of this reasoning because Dr. Duby's testimony clearly means that Claimant was restricted to a maximum of three hours of standing each day. Indeed, the ALJ herself paraphrased his testimony that way by stating that "[m]edical [e]xpert Dr. Duby opined in his hearing testimony that . . . claimant would have been capable of . . . standing *or* walking for up to an hour at a time for a total of six hours (*three hours of each activity*) out of eight hours." (R. 1023) (emphasis added). The only reasonable interpretation of such testimony is that Claimant would need a break after standing for one hour – which the ALJ failed to note – and could not stand for a total of more than three hours each day.

Second, the ALJ stated that Dr. Duby did not "specifically limit[ ] the claimant to three hours of standing total and three hours of walking total" because "that assertion is not consistent with the exertional level definitions in the relevant Regulations." (R. 1023). The ALJ appears to have assumed that a medical expert's testimony must either conform to the regulations' definitions of exertional categories such as sedentary, light, or heavy work or be disregarded to the extent that it fails to do so.[4] Nothing in the regulations supports such a conclusion, however,

---

[4] The ALJ's failure to explain this issue adequately also extends to her reasons for giving great weight to Dr. Duby's opinion. She said that the "opinion is afforded great weight to the extent that it is consistent with the above [RFC]." (R. 1023). Courts have found that "this sort of boilerplate is inadequate, *by itself*, to support" a finding. *Adams v. Astrue*, 880 F.Supp.2d 895, 906 (N.D.Ill. 2012) (addressing a credibility

and neither the ALJ nor the Commissioner has provided any explanation of what could support the ALJ's statement. Moreover, the ALJ's reasoning on this issue contradicted her own RFC findings. Dr. Duby described Claimant's work ability by giving a nuanced account of her work capacity that did not match the regulations' definition of light work item-by-item. He testified, for instance, that she could occasionally climb ladders and use her right foot only frequently. The ALJ accepted these limitations even though they are not itemized in the description of light work under 20 C.F.R. § 404.1567(b). The ALJ failed to explain why the definition of light work justified the rejection of Dr. Duby's testimony on Claimant's ability to stand but did not bar the ALJ from accepting these additional restrictions on her exertional capacity.

Third, the ALJ stated that even if Dr. Duby meant what he said two aspects of the objective evidence showed that Claimant *could* walk up to five hours a day despite the expert's testimony: (1) Claimant had an "abundantly remarkable ambulatory ability," and (2) she did not follow up with treatment for her arthritic big toe. (R. 1023). Neither of these reasons supports the ALJ's rejection of Dr. Duby's RFC assessment.

The ALJ supported her first reason by citing two limited entries concerning Claimant's ability to walk -- Dr. Shah's finding that she had a normal gait and nurse practitioner Mary Karam's April 2012 remark that Claimant "ambulates without difficulty." (R. 1015). Since he reviewed the medical record, Dr. Duby was aware of both of these findings and presumably based his assessment on them. The ALJ never explained what it was about Dr. Shah's and Ms. Karam's comments that contradicted the medical expert's testimony or even what relevance they had to Claimant's capacity for standing during a normal workday. Stating that a person can *walk*

analysis) (emphasis in original). The ALJ went beyond this familiar statement but only cited the same erroneous reasons discussed in this Section below, *infra*. Since this case already requires remand, the ALJ is directed to restate the reasons for accepting Dr. Duby's testimony as part of her reconsideration of his RFC statements.

normally during a brief office exam is not the same as finding that she can *stand* for five hours a day. Dr. Duby clearly testified that Claimant could not do so. The fact that the ALJ reached a different conclusion without citing evidence about Claimant's standing ability is tantamount to "playing doctor." *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to [the] temptation to play doctor and make their own medical findings."); *Armstrong v. Barnhart*, 287 F.Supp.2d 881, 887 (N.D.Ill. 2003) (noting that "playing doctor" ordinarily arises when an ALJ either rejects a doctor's conclusion without citing counter-evidence or when the ALJ draws medical conclusions without relying on evidence for it).

The ALJ's second reason concerning the absence of follow-up care is even more problematic. As noted above, *supra* at Section B(1), Claimant consulted a podiatrist in October 2010 about her right big toe but did not seek additional treatment about her condition. After the first remand of this case to the SSA, the former ALJ disbelieved Claimant's testimony, in part, because she did not "follow-up with a podiatrist or complain to any other doctors about [the] problem with her toe." (R. 534). Judge Rowland pointed out in the second remand decision that the record showed that Claimant did not have Medicaid and that she experienced difficulty paying for her medications. Judge Rowland found that the ALJ had erred by not exploring the reasons why Claimant may not have been able to follow up with her podiatrist and directed the ALJ to address the issue on remand. *Robinson*, 2017 WL 2215022, at *7. The current ALJ acknowledged that directive by noting that the Appeals Council had instructed her to "adequately address barriers to follow-up treatment and the extent to which they impeded further treatment, particularly the claimant's termination from treatment for her toe osteoarthritis due to a lack of Medicaid coverage." (R. 1007).

Instead of following this directive, the ALJ did not question Claimant at the hearing about Medicaid or the lack of treatment for her big toe after October 2010. In fact, the ALJ failed even to raise the issue of Claimant's toe problem even though it was her only severe physical impairment. That requires remand because the regulations instruct an ALJ to "take any action that is ordered by the Appeals Council." 20 C.F.R. § 416.1477(b). The ALJ failure to comply with the Commissioner's regulations constitutes an error of law that necessitates reversal "without regard to the volume of evidence in support of the factual finding." *Worzalla v. Barnhart*, 311 F.Supp.2d 782, 788 (E.D.Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)); *see also Hernandez-Devereaux v. Astrue*, 614 F.Supp.2d 1125, 1134 (D.Ore. 2009) (noting that an ALJ commits reversible error by not following the Appeals Council's instructions). Even if the ALJ had not been ordered to consider the issue, moreover, she was still obligated to ask Claimant about it before citing the absence of follow-up treatment as a reason for discounting Dr. Duby's testimony on her ability to stand. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (stating that "an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference").

Unfortunately, the ALJ's error on this topic goes beyond a failure to comply with the remand instructions. Having disregarded the follow-up care issue at the hearing, the ALJ then criticized Claimant in her decision for not explaining why she could not have obtained further medical treatment. The Court quotes her analysis in full:

> Assertions that this [absence of follow-up care] may have been secondary to loss of insurance and/or lack of access to care fail where, as here, the claimant has not satisfied the requirement of Social Security Ruling 82-59 in order to assert such a defense. Social Security Ruling 82-59 indicates that lack of access to care may be asserted as a basis for not pursuing such care, however, in order to assert this defense, the claimant must prove that "[a]ll possible resources (e.g. clinics, charitable and public assistance agencies, etc.)" and "[c]ontacts with such resources and the claimant's financial circumstances must be documented." The

claimant and her representative have failed to meet the evidentiary burden on
every front of this requirement.

(R. 1022).  This reasoning turns the table on Claimant by shifting the ALJ's own responsibility –
under both the caselaw and the District Court's directive – to initiate questioning about the lack
of follow-up care and placing it directly on Claimant herself.

The ALJ did so, moreover, by relying on a Ruling that has no relevance to this case.  SSR
82-59 addresses a claimant's failure to follow prescribed treatment – but only under a limited set
of circumstances where (1) the claimant has a disabling impairment and (2) a treatment plan has
been put in place that can be expected to restore the claimant's ability to engage in substantial
gainful activity.  *See* 1982 WL 31384, at *1 (1982) ("Individuals with a *disabling impairment*
which is amendable to treatment that could be expected to restore their ability to work must
follow the prescribed treatment to be found under a disability, unless there is a justifiable cause
for the failure to follow such treatment.") (emphasis in original); *see also Hampton v. Colvin*,
No. 1:12-CV-275, 2014 WL 523043, at *6 (N.D.Ind. Feb. 7, 2014).  Neither of these conditions
has been met in this case.  The ALJ did not find that Claimant had a disabling impairment and
Claimant's podiatrist did not prescribe a treatment plan for her toe or any other condition.[5]  *See*
*Molina v. Astrue*, 674 F.3d 1104, 1114 n.6 (9th Cir. 2012) (noting that SSR 82-59 does not apply
when an ALJ finds that a claimant is not disabled).

Remand is therefore necessary so that the ALJ can explain why she did not accept the
walking and standing restrictions that Dr. Duby assessed and why Claimant would be able to

---

[5] Even if SSR 82-59 were relevant, it makes clear that the burden of inquiry lies with the ALJ and not
with the claimant.  *See* 1982 WL 31384, at *2 ("The claimant or beneficiary should be given an
opportunity to fully express the specific reason(s) for not following the prescribed treatment.  Detailed
questioning may be needed to identify and clarify the essential factors of refusal."); *see also Hampton*,
2014 WL 523043, at *6 ("Ruling 82-59 places a significant burden on the ALJ to confirm that
noncompliance is, in fact, the only thing preventing the claimant from working.").

stand up to five hours a day. As part of that analysis, the ALJ is again directed to develop the record concerning any barrier prevent Claimant from receiving follow-up care for her toe arthritis.

**B.     The ALJ's Symptom Analysis Requires Remand**

Once an ALJ finds that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation).

The ALJ began her decision by noting three areas related to Claimant's testimony that the Appeals Council directed her to consider as a result of Judge Rowland's remand order. The first involved Claimant's testimony concerning her alleged need to elevate her legs, which the ALJ appropriately addressed. Second, the ALJ was to explore the "barriers to follow-up treatment . . . particularly the claimant's termination from treatment for her toe osteoarthritis due to a lack of Medicaid coverage." (R. 1007). The ALJ, however, failed to ask Claimant anything about her treatment at the hearing and mistakenly relied on SSR 82-59 to evaluate the issue. That requires

remand so that the ALJ can properly explore the absence of follow-up treatment and comply with the directive she was given.  *See Shauger*, 675 F.3d at 696; *Hernandez-Devereaux*, 614 F.Supp.2d at 1134.

The ALJ also noted that the Appeals Council ordered her to "[a]sk the claimant directly about her allegations of fatigue."  (R. 1008).  Claimant testified at all three hearings that she was so fatigued that she needed to nap for two to three hours each day.  The ALJ in this case claimed that she "attempted to elicit testimony from the claimant regarding her alleged fatigue and need for naps[.]"  (R. 1022).  The ALJ did ask Claimant in general terms about her napping, (R. 1055-56), but her questions concerning fatigue were limited to the following:

> Q:     And then you also reported that you were fatigued.  Did you ever tell a
>         doctor that you had daytime fatigue?
> A:     (No audible response)
> Q:     Who did you tell?
> A:     [Nurse practitioner] Cathy [Moynihan].
> Q:     Did she ever refer you to anyone or –
> A:     Nothing, she did nothing.  She gave me the medicine that made me get big
>         and then told me to take Vitamin D, I don't know why.
> ALJ:   Okay.   All right, those are all my questions.

(R. 1053).  This line of inquiry did not meaningfully address anything about Claimant's fatigue.  The Court notes that the prior ALJ questioned Claimant's allegations of fatigue at significantly greater length at the second hearing held in November 2014.  She asked Claimant, for example, about why she was tired, the length of time she had experienced fatigue, its progression over time, the cause for its increase, her medication, and the symptoms that Claimant experienced related to fatigue.  (R. 559).  The Commissioner has not provided any explanation of why the current ALJ's minimal attempt to develop the record on fatigue at the January 2018 hearing is sufficient when it falls short of the earlier questioning that required remand.  If the first ALJ's

inquiry was insufficient, then the limited questions posed by the new ALJ certainly fail to address what Judge Rowland and the Appeals Council directed her to investigate.

Despite her failure to properly question Claimant, the ALJ gave four reasons in her decision why Claimant's fatigue was not as severe as she claimed. First, the ALJ noted that Claimant denied that she was tired during a medical exam on April 5, 2012. (R. 496). The Court agrees that the ALJ was entitled to cite that as a reason for questioning Claimant's statements though she was still obligated to investigate the fatigue issue at the hearing. That said, the ALJ failed to note that Judge Rowland's remand order cited other evidence concerning Claimant's fatigue. *Robinson*, 2017 WL 2215022, at *8 (referencing psychiatric observations and a questionnaire description of fatigue). That created a potential conflict in the record that required the ALJ to reconcile the April 2012 note with the counter-evidence that Judge Rowland described in her order. "An ALJ . . . is not only allowed to, [s]he must, weigh the evidence, draw appropriate inferences from the evidence, and, where necessary, resolve conflicting medical evidence." *Thorps v. Astrue*, 873 F.Supp.2d 995, 1005 (N.D.Ill. 2012).

Second, the ALJ discounted Claimant's allegations that she was tired because – unlike the prior ALJ – the new ALJ found at Step 2 that fibromyalgia was neither a severe nor a non-severe impairment. The ALJ reasoned that Claimant could not be as tired as she claimed because she had allegedly testified at the second administrative hearing that fibromyalgia was what caused her need for naps. (R. 1022). That misconstrues both the record and the law. Contrary to the ALJ's statement, Claimant never said at the 2014 hearing that fibromyalgia caused her fatigue. (R. 559, "I wasn't sure if it [fatigue] was from my medications or from fibromyalgia"). Even if she had, the ALJ overlooked that a disability applicant is not a medical expert and is not personally responsible for diagnosing the causes of her symptoms. *See Smolen*

*v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (noting that a claimant is not required to "produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom").

Moreover, the ALJ's reasoning results in a logical contradiction in the symptom analysis. The ALJ began her evaluation with language that is frequently used in disability cases: "[C]laimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms" that Claimant alleged. (R. 1018). If the severe impairments that the ALJ found at Step 2 – depression and toe arthritis – were sufficient (at least in principle) to cause Claimant's alleged fatigue, the ALJ could not logically reject what Claimant said about her fatigue because she did *not* have some other impairment like fibromyalgia. Instead of relying on non-existent diagnoses, the ALJ was required to evaluate fatigue based on the impairments that Claimant actually had.

Third, the ALJ criticized Claimant because she allegedly testified that she "could not even remember such a need [to nap] at the time of the hearing." (R. 1022). To the contrary, Claimant told the ALJ at the January 2018 hearing that she always took naps during the day. (R. 1055, "I'm always taking naps since this started").

Fourth, the ALJ discounted Claimant's fatigue because Dr. Duby did not include an accommodation for it in his RFC testimony. That begs the question, however, of what Dr. Duby knew about Claimant's subjective complaints on this issue. Dr. Duby testified that he was familiar with Claimant's medical record but there is no indication that he had reviewed her prior hearing testimony concerning fatigue. (R. 1057). The ALJ's minimal questioning at the January 2018 hearing failed to inform the expert about the scope of her allegations. In sum: the ALJ

could not cite Dr. Duby's RFC assessment as a reason for rejecting Claimant's fatigue allegations without first ensuring that he was aware of what she had to say on the topic.

Finally, the ALJ failed to assess Claimant's daily activities in compliance with the remand instructions. Judge Rowland's 2017 decision criticized the earlier ALJ for not "exploring or describing the duration, frequency, or demands of the activities" that Claimant engaged in on a day-to-day basis. *Robinson*, 2017 WL 2215022, at \*6. Claimant had told the ALJ in May 2012 that she needed to use both hands to grasp items; could only walk less than two blocks at a time; had difficulty maintaining her garden; was fatigued; and needed to elevate her legs two to three hours each day. (R. 66-72). In November 2014, Claimant reiterated her statements about elevating her legs and told the ALJ about her attempts to grow tomatoes as part of her gardening. (R. 552-66). She also stated that she could drive to the grocery store but that it was only five minutes from her home; in addition, she required help carrying groceries into the house. (R. 560-61). Judge Rowland took note of Claimant's restricted activities and directed the ALJ to consider them as part of the symptom analysis. *Robinson*, 2017 WL 2215022, at \*6 (stating that "family members carry the groceries in the house for her and after shopping she has to go to bed for at least an hour, the heaviest thing she could lift was a gallon of milk, with two hands").

Contrary to this directive, the second ALJ overlooked everything that Claimant stated about her daily activities at the first hearing in 2012 and the third hearing in 2018. Instead, she cited two parts of Claimant's testimony at the 2014 hearing. Claimant testified that she could not squat down to garden "without falling over." (R. 558). The current ALJ rejected that claim because consultative examiner Dr. Shah found that she was able to "heel-walk and squat down." (R. 366). The ALJ also noted that Claimant said that she gardened "very little" and only with the

help of others. (R. 1020). The ALJ stated that she was "mindful" of this statement but that it did not prevent Claimant from performing light work. In support, the ALJ noted that Claimant had told her psychiatrist Dr. Blount in 2011 that "my tomatoes are growing well." (R. 426, 1020).

This discussion does not comply with the District Court's order or build a logical bridge between the record and the ALJ's symptom evaluation. Claimant stated more about her gardening than the ALJ addressed. She testified at the 2012 hearing that she only planted six tomato plants in buckets. (R. 76). At the November 2014 hearing, Claimant said that she no longer had an outside garden and, as the District Court noted, "she cared for her plants while sitting in her kitchen." *Robinson*, 2017 WL 2215022, at *6. Moreover, Claimant's former garden was the size of the table she was sitting at during the administrative hearing but it still took her two to three days to plant tomatoes in it. (R. 558, 566). A person who needs three days to plant tomatoes in a space the size of a table can almost certainly not perform light work on a full-time basis. The ALJ was required to do more than note that Claimant was able to grow tomatoes in order to support her symptom evaluation. She needed to account for the limitations that Claimant articulated at the hearing and either explain why Claimant could do more than she stated or address why Claimant's alleged restrictions were consistent with the RFC of light work.

The ALJ's only other consideration of Claimant's ADLs was derived from her September 2010 written function statement. The ALJ stated that Claimant could "persist" in activities such as shopping. (R. 1016). In reality, Claimant stated that she only went shopping twice each month, that it took her two hours to do so, and that she needed to nap one hour after returning home. (R. 199). Claimant also described a limited range of other activities: her husband does most of the cooking; she sometimes cannot bathe each day; is unable to do any yardwork; needs help unloading groceries; can only walk for 10 minutes; and can only do housework such as

sweeping or vacuuming a little at a time. (R.196-203). The ALJ overlooked all of this testimony and once again failed to address the limitations in ADLs that the earlier remand order directed the ALJ to consider.

Finally, the ALJ criticized Claimant's 2014 ADL testimony because of "the potential for pecuniary gain from [the] award of disability benefits [that] could influence the veracity of [her] symptom allegations." (R. 1020). The ALJ raised the same objection concerning Claimant's written functional statements about her mental symptoms. (R. 1019). A claimant's motivation to exaggerate his or her symptoms in order to obtain disability benefits can be a legitimate reason for discounting the claimant's testimony – if evidence exists to support such a finding. *See Rycroft v. Berryhill*, No. 17-0654, 2017 WL 5952679, at *7 (W.D.Wash. Dec. 1, 2017); *see also Britt v. Berryhill*, No. 15 C 10320, 2017 WL 3189329, at *4 (N.D.Ill. July 27, 2017). The ALJ cited no evidence in this case to support her finding. Courts have rejected the kind of unsupported assertion that the ALJ made because, by definition, every claimant applies for disability benefits with the intention of receiving monetary gain. *See Hann v. Comm. of Soc. Sec. Adm.*, 219 F.Supp.3d 1053, 1057 (D.Ore. 2016) (citing cases); *Lucero v. Colvin*, No. 12-cv-2960, 2014 WL 1292859, at *6 (D.Colo. March 27, 2014). "If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible." *Hann*, 219 F.Supp.3d at 1057 (citation omitted). The ALJ did not attempt to differentiate between Claimant and any other disability applicant and therefore had no basis for discounting her testimony based on an alleged pecuniary motive.

Remand is therefore required so that the ALJ can do what the earlier 2017 remand order directed and build a logical bridge between the record and the ALJ's analysis of Claimant's symptoms.

## IV.    CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment [8] is granted.  The Commissioner's cross-motion for summary judgment [19] is denied.   The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.   On remand, the ALJ shall (1) hold another administrative hearing; (2) question Claimant about her alleged fatigue; (3) restate the reasons for the symptom evaluation including an examination of Claimant's daily activities; (4) restate the reasons for the weight given to Dr. Duby's testimony; and (5) explain the basis for the physical RFC with greater clarity.

_____
**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  November 13, 2019**